J-A09018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DERRICK SHARON WRIGHT | : | |
| | : | |
| Appellant | : | No. 1195 WDA 2025 |

Appeal from the Judgment of Sentence Entered May 12, 2025
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000742-2023

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED:  August 3, 2026**

Derrick Sharon Wright appeals from the judgment of sentence entered following his convictions for one count each of conspiracy, robbery, and burglary and four counts of aggravated assault.[1] He challenges the sufficiency of the evidence, the denial of his motion for judgment of acquittal, and imposition of laboratory costs as part of his sentence. We affirm the judgment of sentence.

Wright's convictions stem from the burglary of a home. The Commonwealth presented the following evidence at Wright's jury trial. Julia Gaerttner[2] testified that her ex-boyfriend, Wright, called her asking for a ride. N.T., Jury Trial – Day 4, 2/24/25, at 45-46. She picked Wright up after her

---

[1] 18 Pa.C.S.A. §§ 903, 3701(a)(11), 3502, and 2702, respectively.

[2] The Commonwealth charged Gaerttner with homicide, robbery, and burglary for her involvement with the incident.

work sometime after 11:00 p.m. *Id.* at 46, 49-50. Wright asked her to pick him up from a gas station, and when she arrived she saw Wright and his friend, Money. *Id.* at 50, 51. She testified that she later learned that Money was Shannon Crosby. *Id.* at 51. Crosby told Wright to go "down to the lower east side," and Wright, in turn, told Gaerttner the same. *Id.* at 52. When she arrived at the location, Crosby got out of the vehicle, entered a home, and returned with two men. *Id.* at 53-54. Crosby and the two males sat in the back seat. Wright was in the front passenger seat. *Id.* at 54. Gaerttner testified that she did not know the two males who entered the car with Crosby. *Id.* She explained that the three males were having a conversation in the back seat about going to a party and that Wright was going through her phone to play music. *Id.* at 55.

Crosby then told Wright to go to another location, and Wright instructed Gaerttner to drive to the address. *Id.* She was directed to stop when she got "close to 21st and Perry," at which point she "pulled over, and the two additional people that had got into my car had gotten out of my car. But I was told not to pull off." *Id.* at 56. The two males returned to the vehicle, and as Gaerttner drove away, she saw two "shotgun barrels behind my head in the rearview mirror[.]" *Id.* at 56-57. Gaerttner testified that she was again given directions to drive to another location. *Id.* at 58. She again was told to stop, and all the men left the vehicle, including Wright. *Id.* at 59. Gaerttner testified that Wright did not have a gun and "was talking about how they didn't have enough guns for everybody." *Id.* at 59-60.

Crosby told Gaerttner to "pop your hood and put your four-ways on and knock on that door . . . tell them your car broke down." *Id.* at 60-61. Gaerttner testified that Wright did not ask any questions about the instructions Crosby gave to Gaerttner. *Id.* at 61. When she knocked on the door, a male answered, and at that point, she "got bum-rushed by three people[.]" *Id.* at 63. Gaerttner stated that she ran back to her car while hearing gunshots. *Id.* at 64. She testified that the three people who "bum-rushed" her were the same men who were with her when she initially arrived at the location, but she did not know which of them entered the home. *Id.* at 63. Gaerttner testified that Wright returned to her car with one of the men, but she did not know which one. *Id.* at 65. As she drove away, "[Wright] and whoever else had got in the backseat were yelling at each other. . . . They were yelling about somebody that got hit[.]" *Id.* at 66. Gaerttner was instructed to drop the other male off at 21st Street, and after picking up her brother, she drove home with Wright. *Id.* at 67-68. Gaerttner stated that once they arrived at her home, Wright told her, "Don't say anything." *Id.* at 69.

Wright's co-defendant, Marsea Jones, testified that on the night of the shooting, Crosby called Jones asking if he could use his gun. N.T., Jury Trial – Day 2, 1/26/24, at 15-16. Jones lied to Crosby and told him that he did not have a gun. *Id.* at 16-17. Crosby then called Jamie Smith, who was with Jones at the time. *Id.* at 18. Jones testified that he overheard the conversation between the two and learned that Crosby "was going to get Jamie to take him to his house to get a firearm for [Crosby]." *Id.* at 19. Fifteen minutes later,

Crosby arrived at Jones's house. *Id.* at 19. Crosby told Jones that "he need[ed] [Jones] to make sure he was good," which he interpreted to mean that "he needed [Jones's] help." *Id.* at 19-20. Smith and Jones left with Crosby, and Jones brought a firearm with him. *Id.* at 21. The three males then got in Gaerttner's vehicle. *Id.* at 25. However, Jones testified that he did not know Gaerttner nor the male seated in the front seat of the car. *Id.* at 28. Jones testified that they drove to Smith's house, where Crosby gave Smith two of his cellphones. *Id.* at 29-30. Smith entered his home and returned approximately five minutes later with "a long gun" that Jones described as an assault rifle. *Id.* at 30, 32. He testified that when Smith returned to the vehicle, there were three guns in the vehicle, including the assault rifle, and that Smith gave the rifle to Crosby. *Id.* at 32. He testified that he and Smith had Glocks. *Id.* at 31. According to Jones's testimony, when they arrived at the final location, everyone exited the vehicle and took their guns with them. *Id.* at 35-36. Jones testified that he, Crosby, and Smith were wearing gloves, and everyone, including Wright, was wearing ski masks. *Id.* at 38, 41. He also testified that he believed they were about to "rob the house . . . [b]ecause we [were] standing outside the house with guns." *Id.* at 40.

Saul Felix testified that on the night of the incident, he and three of his friends stayed at an Airbnb. N.T., Jury Trial – Day 1, 1/25/24, at 40. His friends were Abner Gonzalez, Deontray Keomany-Smith, and Kortez Murray. Felix testified that they were in the area to sell fentanyl. *Id.* He stated that while sleeping on the couch, he heard a loud bang at the door, and when he awoke,

he saw the door open with "three or four people with masks and guns." *Id.* at 49. When the individuals entered the property, Keomany-Smith was on a smaller couch, Murray was in a bedroom, and Gonzalez was in the basement. *Id.* at 50. Felix explained that two of the individuals who entered the home had "black AKs," and one of them had a black pistol. *Id.* at 54. Once they entered the home, they told him to get on the ground. Felix testified that he "heard shots go off" and that "then one of them drags me from the front door area into the kitchen. And he has a gun in the back of my head and he said don't move and everything is going to be all right." *Id.* at 54. He described the gun placed against his head as a short pistol. *Id.* at 55. More shots were fired and then the individual who spoke with Felix tried to exit through the sliding door, but due to it being locked, he exited through the front door. *Id.* at 56.

Officers testified that they responded to the scene after receiving a call for a possible stabbing. *Id.*at 141. Upon arrival, they found Crosby bleeding from a gunshot wound to his back. *Id.* at 145, 146. While on scene, officers were alerted that a second gunshot victim arrived at the hospital, later determined to be Kortez Murray. *Id.* at 146, 150. Crosby died, but Murray survived his injuries.

The jury found Wright guilty of conspiracy to commit robbery, robbery, and burglary. It also convicted him of aggravated assault against Felix, Gonzalez, Keomany-Smith, and Murray, for a total of four counts of aggravated assault. The court sentenced Wright to an aggregate term of 14½

to 29 years' incarceration. The court ordered Wright to pay laboratory fees jointly and severally with his co-defendants. *See* Sentencing Order, dated 5/12/25.

Wright filed a post-sentence motion that asserted a motion for judgment of acquittal and a challenge to the imposition of laboratory fees. Regarding the fees, Wright claimed that the court should only order him to pay "$985 in lab fees which accounts for the testing that was incurred to prosecute him, instead of the $29,209.30 requested by the Commonwealth as a lump sum." Defendant's Post-Sentence Motion, filed 5/22/25, at ¶ 102 (emphasis removed). He attached to his motion the Disposition/Commitment paperwork, which reads, "$27,909 J/S lab fees not ordered for co-def's." *Id.* at Exhibit D ("Commitment Paperwork"). The court denied the motion, and this timely appeal followed. *See* Opinion and Order of Court, filed 9/9/25; Order, filed 9/9/2025 (order itemizing laboratory reports fees and costs).

Wright raises the following questions:

1. Whether the evidence presented at trial was insufficient to establish the offense of Conspiracy beyond a reasonable doubt.

2. Whether the trial court erred as a matter of law/abused its discretion in denying [Wright's] oral and written motions for judgment of acquittal where the Commonwealth failed to prove the elements of Conspiracy beyond a reasonable doubt.

3. Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that [Wright] was an accomplice to the crime of Robbery.

- 6 -

4. Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that [Wright] was an accomplice to the crime of Burglary.

5. Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that [Wright] was an accomplice to the crime of Aggravated Assault.

6. Whether the trial court erred as a matter of law/abused its discretion in denying [Wright's] oral and written motions for judgment of acquittal whe[n] the Commonwealth failed to prove the elements of Robbery, Burglary, and the four counts of Aggravated Assault beyond a reasonable doubt and failed to prove that [Wright] was an accomplice to those offenses.

7. Whether the trial court erred in ordering [Wright] to pay all laboratory fees requested by the Commonwealth at sentencing where many of the fees were not necessary to prosecute [Wright].

Wright's Br. at 8-9.

## SUFFICIENCY OF THE EVIDENCE

Wright's first two issues challenge the sufficiency of the evidence to prove conspiracy. He contends "[t]here was absolutely no evidence" presented at trial to prove that he was part of a conspiracy. Wright's Br. at 53. Wright claims "[t]he Commonwealth failed to prove that there was any agreement between any of the parties" or that he "ever entered into an agreement with anyone to commit or aid in an unlawful act." *Id.* at 52. He further argues that the Commonwealth failed to show that Wright "shared 'the mutual specific intent to carry out a particular criminal objective'" with his co-defendants. *Id.* Wright maintains that the Commonwealth's evidence established that he did not speak to anyone in the back seat, did not exit the vehicle, did not have a firearm, and "didn't have any property, money, or drugs when they drove

away[.]" ***Id.*** Wright also claims the Commonwealth's theory that he was a lookout is unsupported by the evidence. He notes that "every witness who addressed [Wright's] whereabouts testified that they were unaware of where he was, but that he didn't enter the house." ***Id.*** at 53. Wright thus alleges that the evidence was insufficient, and the court erred in denying his motion for judgment of acquittal.

Our standard and scope of review for a challenge to the sufficiency of the evidence are settled. A sufficiency claim "presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Packer***, 168 A.3d 161, 166 (Pa. 2017).

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.

***Commonwealth v. Peters***, 320 A.3d 1231, 1236 (Pa.Super. 2024) (*en banc*).

A motion for judgment of acquittal challenges the sufficiency of the evidence. ***See Commonwealth v. Packer***, 146 A.3d 1281, 1284-85 (Pa.Super. 2016), *aff'd*, 168 A.3d 161 (Pa. 2017). We review the denial of such a motion under the same standard as applicable to a sufficiency challenge. ***Id.***

The Crimes Code defines conspiracy as follows:

**(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

"[M]ere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime." ***Commonwealth v. Dixon***, 276 A.3d 794, 801 (Pa.Super. 2022) (citation omitted). Rather, "the Commonwealth must demonstrate that the defendant: (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." ***Commonwealth v. Wellman***, 344 A.3d 13, 19 (Pa.Super. 2025) (quoting ***Commonwealth v. Chambers***, 188 A.3d 400, 409-10 (Pa. 2018)). "A defendant may be convicted of both conspiracy and the offense that was the object of the conspiracy." ***Id.*** (citation omitted). Additionally, since it is not common to have direct evidence of the existence and scope of an agreement to commit an unlawful act, "the Commonwealth may rely upon circumstantial evidence." ***Id.*** "Once the trier of fact finds that there was an agreement and the defendant intentionally

entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy[,] regardless of which co[-]conspirator committed the act." **Dixon**, 276 A.3d at 801 (citation omitted).

Here, the trial court found that there was sufficient evidence to support each of Wright's convictions.

> [W]hile witness Jones testified that he neither knew nor had spoken with [Wright] during the night the offenses were committed, and that witness Gaerttner testified that [Wright] "did not get out of the vehicle when they went to [witness Jones's] house," this Court agrees with the Commonwealth that conspiracy can be inferred from the acts of [Wright] before, during, and after the offenses were committed. This fact was highlighted by the Court in the instructions to the jury about Conspiracy:
>
> > THE COURT: Two or more people conspire to commit a crime if with the intent of encouraging or helping the commission of the crime, they agree that one or both, some, or all of them will commit the crime or an attempt or request to commit it, or that one of them will help the others in planning or committing it or attempting to commit it or asking it to be committed. Their agreement may be expressed in verbal. They may actually talk about it, or their agreement may be an unspoken agreement that can be inferred from their words and conduct and the surrounding circumstances. Each knows what the other is thinking. They don't have to talk about it.
>
> > *See* Transcript of Trial (Day 5 of 5), February 25, 2025, at 16-17 (Emphasis added).
>
> Consistent with the above instruction, the jury found the defendant guilty beyond reasonable doubt of Conspiracy (to commit Robbery), and pursuant to [**Commonwealth v.**] **Baboolal**[, 324 A.3d 1238 (Pa.Super. filed July 17, 2024)

- 10 -

(unpublished mem.)], this Court does not find any reason to overturn the jury's verdict.

During her direct examination, witness Gaerttner confirmed that while [Wright] apparently did not know the two other individuals who entered the car and that [Wright] did not get out of the vehicle when they stopped at witness Jones's house, her testimony provided a factual basis that the conspiracy could be inferred from the acts of her passengers, including [Wright], as follows: 1. that [Wright] was the one delivering the instructions where to go (they were given originally by Crosby while inside the car); 2. that [Wright] was upset when there were not enough guns for everybody, and that he did not have a gun; 3. that [Wright] did not complain nor say anything when Crosby instructed [Gaerttner] to pop her hood, knock on the front door of the house, and pretend to have car trouble; 4. that, after she heard gunshots, only two of the four passengers returned to the car ([Wright] was one of the two); and 5. that [Wright] did not seem confused or unaware of what had happened when he returned to the car. This Court notes that, despite the contentions that [Wright] never mentioned anything about a robbery, breaking into a house, or shooting people, and that he was without a firearm, the facts testified to by witness Gaerttner showed [Wright's] knowledge, assent, and participation to the activities that occurred before, during, and after the felonies were committed. Therefore, this Court finds that conspiracy was sufficiently established.

Opinion and Order of Court at 4-6 (footnotes omitted).

After a review of the briefs, the trial court record, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. *See id.* Viewing the record in the light most favorable to the Commonwealth, with all reasonable inferences in favor of the Commonwealth, the evidence sufficiently established that Wright entered an agreement with his co-defendants to commit or aid in a robbery with others, had a shared criminal intent, and engaged in an overt act in furtherance of the conspiracy.

Wright's next three claims challenge the sufficiency of the evidence for robbery, burglary, and aggravated assault. They hinge on whether there was sufficient evidence of a conspiracy. These claims are meritless. Since the evidence was sufficient to establish conspiracy to commit robbery, Wright was properly held criminally liable for the acts of his co-conspirators in furtherance of the conspiracy. This includes the aggravated assault of the four victims as well as the burglary and robbery. *See Dixon*, 276 A.3d at 801.

Finally, Wright claims that the court erred in denying his motion for judgment of acquittal as to the charges of robbery, burglary, and aggravated assault. He argues that the evidence was insufficient and the Commonwealth had a speculative theory that Wright was an accomplice to the crimes. Like the previous claims, this claim is meritless as well.

**IMPOSITION OF LABORATORY FEES**

In his last issue, Wright argues that the trial court erred by ordering him to pay numerous laboratory fees that he claims were not associated with him. Although the court ordered the fees to be paid jointly and severally, Wright states that the "[d]isposition/[c]ommitment sheet indicated that the lab fees were not ordered for the co-defendants[.]" Wright's Br. at 75. Wright maintains that he is responsible for only two laboratory reports. For the remaining reports, Wright argues that the associated fees were improperly imposed on him because the reports "were not necessary to prosecute [Wright]." *Id.* at 69. He likens his case to *Commonwealth v. Baizar*, No.

449 WDA 2020, 2021 WL 1716967, at *4 (Pa.Super. filed April 30, 2021) (unpublished mem.).

A claim that the court lacked authority to impose costs as part of a defendant's sentencing challenges the legality of a sentence. *See **Commonwealth v. Garzone***, 993 A.2d 306, 316 (Pa.Super. 2010). Our standard of review for such a claim is *de novo*, and our scope of review is plenary. *See **Commonwealth v. Aikens***, 139 A.3d 244, 245 (Pa.Super. 2016). The imposition of costs on a defendant at sentencing is mandatory. 42 Pa.C.S.A. § 9721(c.1). "Any . . . costs associated with the prosecution [] shall be borne by the defendant." 42 Pa.C.S.A. § 9728(g). Such costs may include, "but are not limited to, the costs of convening an investigating grand jury, expert witness fees, clerk costs, buy money, and other expert witness costs to investigate these crimes." ***Commonwealth v. Baney***, 187 A.3d 1020, 1024 (Pa.Super. 2018) (cleaned up).

The Commonwealth submitted costs for numerous reports: for DNA, firearm and tool mark analysis; serology analysis; National Integrated Ballistic Information Network ("NIBIN"); Automated Fingerprint Identification System ("AFIS"); drug identification; and trace evidence analysis.

*DNA Analysis*

The reports for DNA analysis totaled $16,820. One report, E22-00212-18, was for the testing of a buccal swab for Wright. The total fee was $645 and was for DNA analysis plus an administrative handling fee. Another report, E22-00212-6, was for the testing of items such as swabs from numerous

projectiles and swabs from different areas of the home. The associated fee was $14,240 for DNA analysis and administrative handling. This report lists the "case names" as Deontray Smith, Saul Felix, Abner Gonzalez, Kortez Murray, Miciah McLaurin, and the decedent. The final DNA analysis report, E22-00212-17, is for the swabbing of iPhones and a cigarette butt, totaling $1,935 for an administrative handling fee and DNA analysis. The report listed the same "case names," plus Jamie Smith Jr.

*Firearm and Tool Mark Analysis*

The fees for the reports for firearm and tool mark analysis totaled $1,799. One report, E22-00212-12, was for the testing of multiple bullets and cartridge cases. The associated fees were $469 for bullet comparison, cartridge case comparison, and administrative handling. The report identifies the same "case names" as the first report listed above. Another report, E22-00212-4, was for the testing of bullets and cartridge cases. The fees totaled $1,084 for bullet comparison, cartridge case comparison, and administrative handling. This report listed the same "case names" as the first report. The next report, E22-00212-15, is for the testing of cartridge cases that totaled $246. The report also listed the same "case names" as the first report.

*Serology Analysis*

The fees for serology totaled $3,064. One report, E22-00212-16, was for the testing of iPhones and a cigarette butt, and charged $294 for DNA sample preparation. The report listed the same "case names" as the first report, plus Jamie Smith Jr. Reports E22-00212-11, E22-00212-13, and E22-

00212-10, were for the testing of cartridge cases and coins. Each charged $50 for an administrative handling fee. The reports list the same "case names" as the first report. Report E22-00212-3 related to the testing of projectiles, blood swabs, shell casings, and rubber gloves. This report entailed a fee of $2,620 for administrative handling, bloodstain identification and species, DNA sample preparation, and miscellaneous serological examination. The report listed the same "case names" as the first report.

*NIBIN*[3]

The reports for NIBIN totaled $492. One report, E22-00212-8, is for the testing of cartridge cases and coins, totaling $442 for an administrative handling fee and NIBIN Entry/Analysis. The report lists Deontray Smith, Saul Felix, Abner Gonzalez, Kortez Murray, Miciah McLaurin, and the decedent. Another report, E22-00212-10, is for the testing of cartridge cases and coins totaling $50 for an administrative handling fee. The report listed the same individuals.

*AFIS*

The AFIS laboratory reports totaled $4,877. One report, E22-00212-14, is for the fingerprint testing of an iPhone, totaling $50 for an administrative handling fee. The report lists Deontray Smith, Saul Felix, Abner Gonzalez, Kortez Murray, Miciah McLaurin, and the decedent. Another report, E22-

---

[3] Wright claims that the trial court also imposed costs for two other NIBIN reports, E22-00212-11 and E22-00212-13. **See** Wright's Br. at 73. However, the court did not impose costs for these reports. **See** Order, filed 9/9/25.

00212-1, is for fingerprint testing of various items connected to the home, including DVDs and a sliding glass door. The cost totaled $949 for an administrative handling fee, AFIS latent print entry, and AFIS latent print comparison. The report lists Deontray Smith, Saul Felix, Abner Gonzalez, Kortez Murray, Miciah McLaurin, and the decedent. The next report, E22-00212-5, is for the testing of a glass sliding door and DVD, totaling $3,878 for an administrative handling fee, AFIS latent print entry, and AFIS latent print comparison. The report listed the same "case names" as the first report.

*Drug Identification*

Report E22-00212-2 related to the testing of blue tablets. The total for $113 in fees were for administrative handling and drug analysis. The report listed the same "case names" as the first report.

*Trace Evidence Analysis*

The Commonwealth submitted one report, E2200212-7, analyzing stub samples of gunshot residue. The fees totaled $794 for administrative handling and gunshot print residue analysis. The report listed the same "case names" as the first report.

The trial court determined "that the Commonwealth satisfactorily proved that the laboratory reports, fees, and costs were 'ultimately necessary in the prosecution's development of the case against [Wright] and his co-defendants.'" Rule 1925(a) Opinion, filed 11/12/25, at 3 (quoting Opinion and Order of Court at 8). The court further determined that Wright's reliance on **Baizar** was misplaced.

- 16 -

Regarding the issue of laboratory fees and this Court ordering [Wright] to pay all the costs and fees at issue, it must be noted that this Court directed the Commonwealth to file a Response to [Wright's] Post-Sentence Motions. That Response particularly referred to and listed each laboratory fee and cost that [Wright] was being sentenced to pay. The Commonwealth provided detailed explanations (for every laboratory report, fee, and cost) as to why [Wright] should be liable for each of them, which this Court accepted in determining that they would be attributable to [Wright].

Further, this Court has reviewed [*Baizar*] and believes that the defense's reliance on that case is misplaced. In *Baizar*, the Superior Court was specific that the basis of the remand was "to give the Commonwealth and the sentencing court an opportunity to complete the record" for the appellate review and not solely because the defendant therein was not liable to pay the fees. As noted therein:

> We are persuaded that Appellant's argument sounds in the sentencing court's authority, and therefore under *Garzone*, the issue is not subject to waiver. Based on the record before us and the relative brevity of the Commonwealth's Brief and the sentencing court's opinion, we cannot determine whether these laboratory fees were within the sentencing court's authority to impose and therefore compliant with Appellant's due process rights under *Nelson* and *Smith*.

Here, as previously noted, the Commonwealth provided particularities and fully explained in its Response the reason/s to hold [Wright] liable to pay the laboratory fees. Also, the defendant in *Baizar* pled guilty to criminal conspiracy of possession with intent to deliver (PWID). Here, [Wright] had a trial and was found guilty by a jury for Conspiracy – Robbery, Robbery, Burglary, Aggravated Assault – Cause Serious Bodily Injury (against Kortez Murray), Aggravated Assault – Cause Serious Bodily Injury (against Saul Felix), Aggravated Assault – Cause Serious Bodily Injury (against Deontray Keomany-Smith), and Aggravated Assault – Cause Serious Bodily Injury (against Abner Gonzales). Thus, the facts and circumstances in *Baizar* are distinguishable from [Wright's] case.

- 17 -

This Court reiterates that the "costs of prosecution attributable to the defendant" have been defined as "those which are necessary for prosecution when considered in light of the peculiar facts [and circumstances] of each case." *See Commonwealth v. Stefano*, [2024] WL 4212821 (Pa. Super. Ct. Sept. 17, 2024) (non-precedential decision) citing *Commonwealth v. Cutillo*, 440 A.2d [6]07, 609 (Pa. Super. 1982).

*Id.* at 2-3.

The court then detailed its reasoning why each report was necessary for the prosecution of the case.

1. DNA Analysis Lab Report Numbers E22-00212-6 (Report 6) and E22-00212-17 (Report 17) – as these are fees necessary to develop the profiles against which [Wright's] DNA was tested; 2. Serology Lab Report Numbers E22-00212-16 (Report 16) and E22-00212-3 (Report 3) – as these were used to establish what occurred in the AirBnb on January 27, 2025, who was present inside the house, etc.; 3. Firearm and Toolmark Lab Report Numbers E22-00212-12 (Report 12), E22-00212-4 (Report 4), and E22-00212-15 (Report 15) – as these are relevant to establish that at least one of [Wright's] co-defendants possessed a firearm and used it in the commission of the Conspiracy – Robbery and Robbery under the conspiracy and/or accomplice liability theories and their elements; 4. NIBIN Report Numbers E22-00212-8 (Report 8) and E22-00212-10 (Report 10) – as these were necessary to establish possession of firearms in at least one of the co-defendants of [Wright] and that, for Report 8, it was used to link [Wright's] co-defendant, Smith, to the incident; 5. [T]he handling fee of $50 for each AFIS Lab Reports – as these reports were used to compare the prints of [Wright] to the analysis of the latent prints; 6. Trace Evidence Lab Report Number E22-00212-7 (Report 7), amounting to $620 and the $50 handling fee – as these were utilized to analyze GSR on Crosby and co-defendant, Kortez Murray for the prosecution of Robbery and Conspiracy; and 7. Drug Identification Lab Report Number E22-00212-2 (Report 2) – as presence of drugs was established as the motive in the commission of these offenses.

Opinion and Order of Court at 9. The court "stresse[d]" that the tests and reports were necessary "for the Commonwealth to prove the liability of [Wright]; thus, are considered costs attributable to [Wright.]" *Id.* at 9-10.

After our review of the briefs, the trial court record, the relevant law, and the trial court's opinion, we affirm on the basis of the trial court's opinion. *See id.* Though Wright's name is not listed on every laboratory report, the content of each report related to Commonwealth's case against Wright.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  8/3/2026